FILED

2022 Mar-24  PM 12:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

|  |  |  |
|---|---|---|
| **SHERRY PEARCE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:  7:20-cv-01797-AMM** |
| | ) | |
| **SOCIAL SECURITY** | ) | |
| **ADMINISTRATION,** | ) | |
| **Commissioner,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OF DECISION

Plaintiff Sherry Pearce brings this action pursuant to the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying her claim for a period of disability and disability insurance benefits ("benefits") and supplemental security income. *See* 42 U.S.C. §§ 405(g), 1383(g). Based on the court's review of the record and the parties' briefs, the court **AFFIRMS** the decision of the Commissioner.

## I.    Introduction

On August 14, 2018, Ms. Pearce protectively filed an application for benefits under Title II of the Act alleging disability as of June 12, 2015. R. 10, 100, 227–33. Also on August 14, 2018, Ms. Pearce protectively filed an application for

supplemental security income under Title XVI of the Act, alleging disability as of June 12, 2015. R. 10, 85, 221–26. Ms. Pearce's application alleges disability due to back problems, high blood pressure, carpal tunnel, migraine headaches, chest pain, high cholesterol, depression, anxiety, insomnia, acid reflux, arthritis in lower back, neck pain, swollen hands and feet, obesity, memory loss, shoulder pain, and chronic sinus issues. R. 86. She has at least a high school education and has past relevant work experience as a grader dressed poultry, cashier, short order cook, and stamping press operator. R. 20.

The Social Security Administration ("SSA") initially denied Ms. Pearce's applications on November 29, 2018. R. 10, 85–114. On December 31, 2018, Ms. Pearce filed a request for a hearing before an Administrative Law Judge ("ALJ"). R. 10, 137–38. That request was granted. R. 139–41. Ms. Pearce received a video hearing before ALJ Renita F. Barnett-Jefferson on February 6, 2020. R. 10, 37–60. On March 11, 2020, the ALJ issued an unfavorable decision, finding that Ms. Pearce was not disabled from June 12, 2015 through the date of the decision. R. 10–21. Ms. Pearce was 37 years old at the time of the ALJ decision. R. 21, 100.

Ms. Pearce appealed to the Appeals Council. R. 217–20. Ms. Pearce's representative submitted a letter to the Appeals Council on March 26, 2020 outlining her argument on appeal. R. 364–65. After the Appeals Council denied Ms. Pearce's

request for review of the ALJ's decision, R. 1–3, the ALJ's decision became the final decision of the Commissioner and subject to this court's review.

The Act establishes a five-step test for the ALJ to determine disability. 20 C.F.R. §§ 404.1520, 416.920. *First*, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). "Substantial work activity is work activity that involves doing significant physical or mental activities." 20 C.F.R. §§ 404.1572(a), 416.972(a). "Gainful work activity" is work that is done for pay or profit. 20 C.F.R. §§ 404.1572(b), 416.972(b). If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability. 20 C.F.R. §§ 404.1520(b), 416.920(b). *Second*, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii), (c). Absent such impairment, the claimant may not claim disability. *Id. Third*, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926.  If such criteria are met, the claimant is declared disabled. 20 C.F.R.  §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii)a.

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ still may find disability under the next two steps of the analysis. The ALJ must first determine the claimant's residual functional capacity, which refers to the claimant's ability to work despite his impairments. 20 C.F.R. §§ 404.1520(e), 404.1545, 416.920(e), 416.945. In the *fourth* step, the ALJ determines whether the claimant has the residual functional capacity to perform past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the ALJ determines that the claimant is capable of performing past relevant work, then the claimant is deemed not disabled. *Id.* If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the *fifth* and final step. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). In this step, the ALJ must determine whether the claimant is able to perform any other work commensurate with his residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1). Here, the burden of proof shifts from the claimant to the Commissioner to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given his residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1520(g)(1), 404.1560(c), 416.920(g)(1), 416.960(c).

The ALJ determined that Ms. Pearce meets the insured status requirements of the Act through December 31, 2018. R. 12. Next, the ALJ found that Ms. Pearce had

not engaged in substantial gainful activity since her alleged onset date of disability, June 12, 2015. R. 12. The ALJ decided that, since that date, Ms. Pearce has had the following severe impairments: lumbar degenerative disc disease, obesity, migraines, obstructive sleep apnea, depression, hypertension, and angina. R. 13. The ALJ determined that Ms. Pearce did not have "an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" to support a finding of disability. R. 13.

The ALJ found that Ms. Pearce had the "residual functional capacity to perform light work" with certain limitations. R. 15. The ALJ determined that Ms. Pearce can: frequently perform bilateral pushing and pulling of foot controls; frequently perform bilateral pushing and pulling of hand controls; occasionally reach overhead, bilaterally; frequently handle items with her hands; frequently finger items with her hands; occasionally climb ramps and stairs; frequently balance, kneel, crouch, and crawl; occasionally stoop; occasionally be exposed to extreme cold, extreme heat, and vibration; perform simple tasks; frequently interact with supervisors, coworkers, and the public; occasionally have changes in a routine work setting. R. 15. The ALJ determined that Ms. Pearce should never climb ladders and scaffolds, never work at unprotected heights or around hazardous, moving mechanical parts, and never operate a motor vehicle for commercial purposes. R. 15.

Additionally, the ALJ found that Ms. Pearce should be allowed a "sit/stand at will option." R. 15.

According to the ALJ, Ms. Pearce is "unable to perform any past relevant work," she is a "younger individual," and she has "at least a high school education," as those terms are defined by the regulations. R. 19–20. The ALJ determined that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills." R. 20. Because Ms. Pearce's "ability to perform all or substantially all of the requirements of this [light] level of work has been impeded by additional limitations," the ALJ enlisted a vocational expert to ascertain whether there are a significant number of jobs in the national economy that Ms. Pearce is capable of performing. R. 20. That expert concluded that there are indeed a significant number of such jobs in the national economy, such as a sorter I, garment sorter, and marker. R. 21.

Based upon these findings, the ALJ concluded that Ms. Pearce did not have a disability as defined in the Act, from June 12, 2015 through the date of her decision, March 11, 2020. R. 21. Ms. Pearce now challenges that decision.

## II.    Factual Record

The record reflects that Ms. Pearce was involved in a motor vehicle accident in 2014. R. 371.

Ms. Pearce presented to the GCH Physicians Clinic on November 24, 2014 with right knee pain. R. 398. She reported that she was getting ready to mop the floor, fell, and heard a pop. R. 398. She was prescribed medication and advised to follow up in a week. R. 398. On March 6, 2015, Ms. Pearce presented to GCH Physicians Clinic for medication refills for depression. R. 396–97.

Ms. Pearce began experiencing right arm numbness and tingling with neck and shoulder pain in March 2015 and underwent an MRI on May 1, 2015. R. 371–72. The MRI showed: "At C6/C7, there is a right paracentral herniated disc with disc material extending up to the right intraneural foramen. The disc causes deformity of the right ventral side of the cervical cord with slight counter clockwise rotation." R. 371. Mr. Pearce was referred by her primary care physician, Dr. Colie Crutcher, to Dr. Lenard Rutkowski. R. 372. Ms. Pearce saw Dr. Rutkowski on June 2, 2015 for "neck pain that radiates down the right upper extremity." R. 372. Dr. Rutkowski diagnosed Ms. Pearce with "Prolapsed cervical intervertebral disc – Right C6-C7 disc extrusion: acute, severe" and noted that surgical intervention was required. R. 377.

Ms. Pearce underwent a cervical discectomy. R. 367, 386. Ms. Pearce presented to Dr. Rutkowski on July 21, 2015 for a post-operation visit. R. 367. She

reported doing "a lot better than . . . before surgery," but did report "some pain and soreness when she moves certain ways and gets up and down." R. 367. Her wound was healing well. R. 368. Ms. Pearce presented to Dr. Rutkowski on August 14, 2015 for her second post-operation visit. R. 369. Ms. Pearce complained of "some soreness in her neck" along with an eye issue. R. 369.

On September 25, 2017, Ms. Pearce presented to Dr. Keith Roberts complaining of trouble swallowing food. R. 380. On October 5, 2017, Dr. Roberts performed an esophagogastroduodenoscopy with biopsy. R. 378. On October 13, 2017, Ms. Pearce presented to Dr. Roberts who noted her condition had improved and that she was to continue PPI medication and dietary modification. R. 382.

Nurse Practitioner Ashley Wagner completed a Consultative Examination on October 27, 2018. R. 385–91. Ms. Pearce reported the following chief complaints: "1. Neck pain/Back 2. Bilateral hand numbness X 4 years." R. 385. Ms. Pearce attributed her "worsening symptoms to neck surgery." R. 385. Nurse Practitioner Wagner's functional status states as follows:

> Sitting: Problems sitting greater than 1 hour due to back pain.
> Standing: Reports difficulty standing greater than 10 min
> Walking: Reports difficulty walking for a short distance due to neck and back pain []

R. 385.

Nurse Practitioner Wagner's physical exam revealed the following with respect to Ms. Pearce's back: "Paraspinal muscle tenderness noted in the cervical and lumbar. Range of motion of cervical and lumbar spine – see chart." R. 387. Nurse Practitioner Wagner's physical exam revealed the following with respect to Ms. Pearce's extremities: "Range of motion of bilateral upper and lower extremities – see chart. No edema, cyanosis, clubbing, or swollen joints. Dorsalis Pedis and Posterior Tibial Pulses Present and equal bilaterally." R. 387. Nurse Practitioner Wagner's physical exam revealed the following with respect to Ms. Pearce's neuromuscular:

> Strength: (Normal = 5/5)
> Right upper extremity: 5/5
> Left upper extremity: 5/5
> Right lower extremity: 5/5
> Left lower extremity: 5/5
> Right grip: 4/5
> Left grip: 5/5
>
> Dexterity: able to pinch, grab, manipulate
>
> Dominate Hand: right
>
> CNs II-XII: intact
>
> Romberg: negative
>
> Sensory: normal

R. 387. Nurse Practitioner Wagner also noted that all reflexes were normal, Ms. Pearce had "[n]ormal gait and station," and Ms. Pearce had no difficulty getting on

and off the examination table; walking on her heels; walking on her toes; squatting and rising; and putting her finger to her nose. R. 387–88. Nurse Practitioner Wagner noted that Ms. Pearce's range of motion was normal for all examined joints. R. 388–90. Nurse Practitioner Wagner stated Ms. Pearce's limitations as follows: "Patient is unable to complete work related activities that require frequent bending, sitting. Lifting or standing due to injuries sustained" in a motor vehicle accident. R. 390.

Dr. Mark Prohaska completed a disability evaluation on November 7, 2018. R. 393–94. Dr. Prohaska stated that Ms. Pearce "reports some struggles with anxiety and depression for which she is prescribed an antidepressant by her general practitioner, though she has never sought any formal mental health treatment and her mood issues do not appear to be a significant limiting factor in her daily functioning." R. 393.

Family physician Dr. Colie Crutcher also treated Ms. Pearce throughout the relevant period for hypertension, back pain and swelling, cold symptoms, pain and headaches, angina, low and mid back pain, aching all over, sinus issues, urinary discomfort, mouth pain, excessive sweating, bilateral knee pain, right foot heel pain, neck discomfort, and ear pain. R. 401–26, 493–98.

Ms. Pearce presented to MFI Neurology on February 25, 2019 for migraine headaches. R. 455. She reported having headaches for several years, but not taking migraine prevention medication. R. 455. She also reported neck and back pain, but

her physical exam revealed that she was able to shrug her shoulders, normal posture, normal muscle strength, normal muscle tone, grade 5 grip strength, and normal gait. R. 457–58. Ms. Pearce underwent an MRI of the brain on March 8, 2019, which showed "minimal nonspecific white matter changes . . . otherwise, unremarkable study." R. 464. Ms. Pearce presented to MFI Neurology on April 22, 2019 to follow up on migraine headaches. R. 447. She reported that her headaches had gotten worse and she was experiencing them "almost daily." R. 447. She reported no musculoskeletal symptoms, and her physical exam revealed: "Posture normal, Muscle strength upper and lower extremities normal, Muscle tone normal." R. 449. Ms. Pearce presented to MFI Neurology on August 20, 2019 to "follow up for migraine headaches." R. 444. She reported that new medication was helping greatly, however she reported "tingling in the toes" since starting the new medication. R. 444. Ms. Pearce presented to MFI Neurology on November 20, 2019 to "follow up for migraine headaches." R. 440. Ms. Pearce reported six migraines a month but stated she was "much better than before when she was reporting daily migraines." R. 440. She also reported that the numbness in her toes had resolved. R. 440.

Ms. Pearce presented to the West Alabama Mental Health Center for evaluation for depression or mood disorder on September 27, 2019. R. 467. Ms. Pearce reported "history of depression, mood disorder," and "psychotic features [that] began after a car accident in 2014." R. 467. She was diagnosed with "[s]evere

recurrent major depression w/ psychotic features, mood-congruent." R. 476. Ms. Pearce began a therapy plan. R. 477.

## III.    Standard of Review

This court's role in reviewing claims brought under the Act is a narrow one. The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. §§ 405(g), 1383(c)(3); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The Act mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *see* 42 U.S.C. §§ 405(g), 1383(c)(3). This court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the record as a whole and determine if the decision is reasonable and supported by substantial evidence. *See Martin*, 894 F.2d at 1529 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If the Commissioner's factual findings

are supported by substantial evidence, they must be affirmed even if the preponderance of the evidence is against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. However, no decision is automatic, for "[d]espite th[e] deferential standard [for review of claims], it is imperative that th[is] Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987) (citing *Arnold v. Heckler*, 732 F.2d 881, 883 (11th Cir. 1984)). Moreover, failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

## IV.   Discussion – ALJ's Narrative Discussion of Residual Functional Capacity

Ms. Pearce alleges that the ALJ's decision should be reversed and remanded because the ALJ's determination of Ms. Pearce's residual functional capacity was not based on substantial evidence. Doc. 10 at 1. Specifically, Ms. Pearce argues that the ALJ's decision "is internally inconsistent by finding the opinion of the physical consultative examiner persuasive, but failing to adopt those findings." *Id.*

Social Security Ruling 96-8p ("SSR 96-8p") regulates the ALJ's assessment of a claimant's residual functional capacity. Under SSR 96-8p, the residual functional capacity "assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." SSR 96-8p at *1, 1996 WL 374184 (July 2, 1996). The residual functional capacity "is not the *least* an individual can do despite . . . her limitations

or restrictions, but the *most*." *Id.* The ruling specifically mandates a narrative discussion of "the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." *Id.* at *7. Additionally, in cases where symptoms are alleged, the assessment of a claimant's residual functional capacity must: "Contain a thorough discussion and analysis of the objective medical and other evidence . . . ; Include a resolution of any inconsistencies in the evidence as a whole; and Set forth a logical explanation of the effects of the symptoms . . . on the individual's ability to work." *Id.*

The residual functional capacity assessment "must be based on *all* of the relevant evidence in the case record, such as: Medical history, Medical signs and laboratory findings, The effects of treatment . . . , Reports of daily activities, Lay evidence, Recorded observations, Medical source statements, Effects of symptoms . . . , Evidence from attempts to work, Need for a structured living environment, and Work evaluations, if available." *Id.* at *5.

It is the ALJ's exclusive responsibility to assess the claimant's residual functional capacity. *Moore v. Comm'r*, 649 F. App'x 941, 945 (11th Cir. 2016). The Eleventh Circuit has held that, even when the ALJ could have been "more specific and explicit" in his or her findings with respect to a claimant's "functional

limitations and work-related abilities on a function-by-function basis," those findings nonetheless satisfy the requirements of SSR 96-8p if the ALJ considered all of the evidence. *Freeman v. Barnhart*, 220 F. App'x 957, 959–60 (11th Cir. 2007); *see also Castel v. Comm'r of Soc. Sec.*, 355 F. App'x 260, 263 (11th Cir. 2009) (an ALJ's finding is sufficiently detailed despite lacking an express discussion of every function if there is substantial evidence supporting the ALJ's residual functional capacity assessment). In addition, the ALJ is not required to "specifically refer to every piece of evidence in his decision," so long as the decision is sufficient to allow the court to conclude that the ALJ considered the claimant's medical condition as a whole. *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005).

Ms. Pearce asserts the limitations in the ALJ's assessment of her residual functional capacity are inconsistent with the opinion of the physical consultative examiner, Nurse Practitioner Ashley Wagner. Doc. 10 at 3–8. Specifically, Ms. Pearce argues that Nurse Practitioner Wagner's medical opinion "would not allow for frequent lifting or carrying of objects, as included in the definition of light work," "would not allow for a good deal of walking or standing, as included in the definition of light work," and would limit Ms. Pearce "to only occasional bending." *Id.* at 7. Additionally, Ms. Pearce argues that the limitation in her residual functional capacity to a sit/stand option, contradicts Nurse Practitioner Wagner's opinion that "she can

sit less than one-third of the workday and stand less than one-third of the workday."

*Id.*

After step three in the sequential evaluation, the ALJ carefully considered the "entire record" when forming Ms. Pearce's residual functional capacity. R. 15. The ALJ stated that she found Ms. Pearce has the residual functional capacity to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can frequently perform bilateral pushing and pulling of foot controls. She can perform frequent bilateral pushing and pulling of hand controls. [Ms. Pearce] could occasionally reach overhead, bilaterally. She can handle items frequently with the left and right hand. She can frequently finger with the left and right hand. [Ms. Pearce] can climb ramps and stairs occasionally and never climb ladders or scaffolds. She can frequently balance, kneel, crouch and crawl and stoop occasionally. [Ms. Pearce] can never work at unprotected heights or around hazardous, moving mechanical parts and never operate a motor vehicle for commercial purposes. She could have occasional exposure to extreme cold, extreme heat[,] and vibration. [Ms. Pearce] can perform simple tasks and frequently interact with supervisors, coworkers[,] and the public. She is able to tolerate occasional changes in a routine work setting. She should be allowed a sit/stand at will option.

R. 15. The ALJ summarized Ms. Pearce's function report, hearing testimony, and the medical evidence of record. R. 16–17. Then the ALJ evaluated the medical opinions of Dr. Robert Estock, Dr. Thomas Amason, Dr. Mark Prohaska, and Nurse Practitioner Ashley Wagner. R. 17–18. With respect to Nurse Practitioner Wagner, the ALJ stated:

> The medical opinion of nurse practitioner, Ashley Wagner is persuasive. [Ms. Pearce] was diagnosed with neck pain, lumbago[,] and obesity. Ms. Wagner indicated that [Ms. Pearce] would be unable to complete activities that require frequent bending, sitting, lifting[,] or standing due to injuries sustained in a motor vehicle accident. Thus, the undersigned has limited the claimant to a light exertional level, with a sit/stand opinion at will and occasional stooping, kneeling, crouching[,] and crawling.

R. 18 (citations omitted).[1]

As required, the ALJ considered the medical source statements in conjunction with "*all* of the relevant evidence in the case record" when forming Ms. Pearce's residual functional capacity. SSR 96-8p at *5. The ALJ implicitly adopted Nurse Practitioner Wagner's diagnoses of neck pain and lumbargo as well as her limitations in bending, sitting, lifting, and standing when formulating a residual functional capacity for light work with additional limitations and a sit/stand option. *See* R. 15, 18. The ALJ accepted these limitations even in light of the relatively normal physical exam results reported by Nurse Practitioner Wagner. *See supra* Section II. For example, Nurse Practitioner Wagner noted that while Ms. Pearce had "muscle tenderness . . . in the cervical and lumbar" spine, there was no "edema, cyanosis, clubbing, or swollen joints." R. 387. Additionally, Ms. Pearce had normal strength

---

[1] There is a discrepancy between the *occasional* kneeling, crouching, and crawling in the narrative discussion of Nurse Practitioner Wagner's medical opinion, R. 18, and the *frequent* kneeling, crouching, and crawling in the delineation of Ms. Pearce's residual functional capacity, R. 15, but Ms. Pearce did not raise this issue. In any event, the court's analysis is limited to the question whether the residual functional capacity is supported by substantial evidence.

in all extremities and grip, the ability to pinch, grab, and manipulate, and normal gait and station. R. 387–88. She showed no difficulty in getting off and on the examination table, walking on her heels and toes, squatting and rising, and putting her finger to her nose. R. 388. And, her range of motion and reflexes were all normal. R. 388–90.

The ALJ's reliance on the opinion of Nurse Practitioner Wagner is in contrast to the ALJ's consideration of the opinion of state agency physician Dr. Amason, whom the ALJ found to be only "partially persuasive." R. 18. Although Dr. Amason "limited the claimant to a medium exertional level," the ALJ noted that "evidence at the hearing level reveals greater limitations" and limited Ms. Pearce to "light work activity." R. 18.

Ultimately, the ALJ formed a residual functional capacity by taking into account "[t]hose limitations that have a conceivable basis in the verifiable impairments described in the medical files." R. 18. With respect to Ms. Pearce's physical limitations, the ALJ concluded:

> In regards to lumbar degenerative disc disease, the medical evidence reveals that [Ms. Pearce] reported complaints of back pain. She underwent an Anterior Cervical Discectomy and Fusion in July 2015 and her postoperative treatment reveals that she was doing well. In addition, later examinations reveal [Ms. Pearce] has normal muscle, tone, and 5/5 in the upper and lower extremities. She had normal gait and was in no acute distress. [Ms. Pearce] has had no additional surgeries and her condition is being treated with medication.

R. 18 (citations omitted). The ALJ also stated:

> After a thorough review of all the evidence of record, including [Ms. Pearce's] allegations and testimony, forms completed at the request of the Social Security Administration, the objective medical findings, the medical opinions, and other relevant evidence, the undersigned finds that the claimant is capable of performing work consistent with the residual functional capacity established in this decision.

R. 19.

The conditions in the residual functional capacity were well-explained and well-supported by medical evidence. Therefore, the court concludes that that ALJ's formation of Ms. Pearce's residual functional capacity is supported by substantial evidence.

## VI.   Conclusion

The court concludes that the ALJ's determination that Ms. Pearce is not disabled is supported by substantial evidence and the proper legal standards were applied in reaching this determination. The Commissioner's final decision is therefore affirmed. A separate order in accordance with this memorandum of decision will be entered.

**DONE** and **ORDERED** this 24th day of March, 2022.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE